**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**NATIONAL NUMISMATIC**
**CERTIFICATION, LLC., ASA**
**ACCUGRADE, INC., TREASURE**
**GALLERY, INC.,  CENTSLES, INC.,**

**Plaintiffs,**

-vs-                                                            **Case No.  6:08-cv-42-Orl-19GJK**

**EBAY, INC., AMERICAN NUMISMATIC**
**ASSOCIATION, PROFESSIONAL**
**NUMISMATISTS GUILD, INC.,**

**Defendants.**

_____

**ORDER**

This case comes before the Court on the following:

1.      Motion of Defendant Professional Numismatists Guild, Inc. to Dismiss Counts I and III of

the Complaint for Damages and Injunctive Relief and Integrated Memorandum of Law (Doc.

No. 19, filed Feb. 11, 2008);

2.      Motion of Defendant eBay to Dismiss Plaintiffs' Complaint Pursuant to Federal Rule of

Civil Procedure 12(b)(6) and Memorandum of Points and Authorities in Support Thereof

(Doc. No. 25, filed Feb. 15, 2008);

3.      Motion of American Numismatic Association to Dismiss Plaintiff[s'] Complaint with

Supporting Memorandum of Law (Doc. No. 30, filed Feb. 22, 2008);[1]

_____

[1]      Plaintiffs filed an Amended Complaint after the Defendants filed their Motions to
Dismiss, and each Defendant then filed a second Motion to Dismiss directed at Plaintiffs' Amended
Complaint.  The first and second round of Motions to Dismiss raise the same arguments and seek
identical relief.  Accordingly, the Court considers the first round of Motions to be moot because of

(continued...)

4.      Motion of Defendant Professional Numismatists Guild, Inc. to Dismiss Counts I and III of the First Amended Complaint for Damages and Injunctive Relief and Integrated Memorandum of Law (Doc. No. 40, filed Mar. 17, 2008);

5.      Motion of American Numismatic Association to Dismiss Plaintiffs' Amended Complaint with Supporting Memorandum of Law (Doc. No. 44, filed Mar. 31, 2008);

6.      Memor[a]ndum in Opposition to Defendant PNG's Motion to Dismiss (Doc. No. 45, filed Mar. 31, 2008);

7.      Memorandum in Opposition to Defendant ANA's Federal Rule of Civil Procedure 12(b)(6) Motion to Dismiss Plaintiffs' First Amended Complaint (Doc. No. 51, Apr. 14, 2008);

8.      Motion of Defendant eBay Inc. to Dismiss Plaintiffs' First Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) and Memorandum of Points and Authorities in Support Thereof (Doc. No. 52, filed Apr. 15, 2008); and

9.      Memorandum in Opposition to Defendant eBay's Federal Rule of Civil Procedure 12(b)(6) Motion to Dismiss Plaintiffs' First Amended Complaint (Doc. No. 56, filed Apr. 28, 2008).

## Background

### I.      The Parties

Plaintiffs National Numismatic Certification, LLC ("NNC"), ASA Accugrade ("ACG"), Treasure Gallery, Inc., and Centsles, Inc. filed this action against Defendants eBay, Inc., American Numismatic Association ("ANA"), and Professional Numismatists Guild, Inc. ("PNG"), alleging that Defendants are liable for two Florida common-law torts, trade libel and conspiracy to commit

---

[1](...continued)
the later filed Amended Complaint and second round of Motions to Dismiss.

trade libel,[2] and also violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). (Doc. No. 37, filed Mar. 7, 2008.)   Defendants have moved for dismissal of the claims.

This dispute concerns numismatics, popularly known as coin collecting.  According to the Amended Complaint, Plaintiffs NNC and ASG are "coin graders."  (Doc. No 37 ¶¶ 2-3.)  Plaintiffs Treasure Gallery and Centsles are coin dealers in the business of buying and selling coins in various fora, including internet sales through the online auctioneer, eBay.  (*Id.* ¶¶ 4-5.)

Defendant ANA is a not-for-profit, federally-chartered corporation that "acts as the preeminent trade association in the numismatic hobby and multi-billion dollar industry associated with the numismatic hobby."  (*Id.* ¶ 6.)  PNG is an Ohio not-for-profit corporation that also serves as a trade association for the numismatic industry.  (*Id.* ¶ 7.)  The Amended Complaint describes Defendant eBay as a "foreign corporation that provides a forum for the purchase and sale of merchandise, including coins, over the internet . . . ." (*Id.* ¶ 8.)  Since the late 1990's, eBay has provided the principal forum for the trading of United States and Canadian coins over the internet. (*Id.* ¶ 11.)

## II.    The Allegedly Defamatory Statements and Unfair Practices

Plaintiffs allege that NNC and ACG graded coins have been bought and sold in eBay auctions through various dealers such as Treasure Gallery and Centsles without any complaints concerning the coins' authenticity.  (*Id.* ¶ 12.)  Nevertheless, in 2001, PNG formed a group known as the "Internet Rules Committee" which was comprised of various "coin industry insiders" such as Barry Suppler, a "member and/or director of PNG."  (*Id.* ¶ 13.)  Plaintiffs allege that the "primary

---

[2]     The Complaint alleges that PNG is liable for conspiracy to commit trade libel but not for the tort of trade libel itself.

purpose of the [committee] . . . was to interfere and obstruct the ability of the smaller coin grading services, including ACG, to participate in the then burgeoning coin marketplace on eBay by, among other things, formally and informally accusing Plaintiffs of selling 'counterfeit' coins . . . ." (*Id.* ¶ 13.)  In 2004, ANA and eBay officially formed a Coins Community Watch Group ("CCW"),[3] describing it as a "collaborative effort among a team of hobby experts, the ANA, and eBay for the purpose of combating misrepresented or fraudulent listings involving coins and other numismatic items." (*Id.* ¶ 14.) eBay later described the CCW and its role in the auction system as follows: "(1) the CCW team is comprised of industry/community experts who selectively review listings for violations and submit claims; (2) [t]he ANA corroborates claims and tries to resolve with seller; [and] (3) [u]nresolved issues are escalated to eBay for the appropriate remedy." (*Id.* ¶ 15.) "Upon information and belief," Plaintiffs allege that "the industry experts that were made part of the CCW included the very same individuals that made up the PNG 'Internet Rules Committee.'" (*Id.* ¶ 16.)

Plaintiffs allege that in 2006 PNG and the Industry Council for Tangible Assets commissioned "an unfair and deceptive survey of coin dealers and solicited opinions about ACG from coin dealers [who] had never dealt in ACG graded coins (and ignored the positive comments of those dealers who had), and publicized the illegitimate, false and damaging results of the 'survey' on the PNG website, ANA website, Stuppler's website, and elsewhere." (*Id.* ¶ 17.)  According to Plaintiffs, even after being informed and becoming "fully aware" that the survey was "unfair and deceptive," Defendants "nevertheless have utilized it to defame Plaintiff ACG." (*Id.*, ¶ 18.) PNG's January 5, 2007 press release describing the survey reads as follows:

---

[3]      This is the abbreviation used by the parties.

(Orlando, FL) - The Professional Numismatists Guild (PNG) and the Industry Council For Tangible Assets (ICTA) have jointly released results of their third dealer's survey of rare coin authentication and grading services. The survey indicates the professional opinions of numismatists who buy and sell coins for a living.

Survey respondents were asked for their professional opinions to evaluate eleven grading services based on 12 different weighted criteria, such as grading and authentication accuracy. Each category was ranked by the respondents on a ten-point scale ranging from the lowest, Unacceptable, to the highest, Outstanding.

The final tally lists no grading service as "Outstanding."

**Numismatic Guaranty Corporation of America** (NGC) of Sarasota, Florida and **Professional Coin Grading Service** (PCGS) of Newport Beach, California were rated[] "**Superior**."

**ANACS** of Austin, TX and **Independent Coin Grading Company** (ICG) of Englewood, Colorado were ranked "**Good**."

**PCI, Inc**. (PCI) of Rossville, Georgia and **Sovereign Entities Grading Service** (SEGS) of Chattanooga, Tennessee were listed as "**Poor**."

**ASA-Accugrade, Inc.** (ACG) of Longwood, Florida, **Numistrust Corporation** (NTC) of Boca Raton, Florida, **Hallmark Coin Grading Service** (HCGS) of Vancouver, BC, Canada, **American Coin Club Grading Service** (ACCGS) of Beverly Hills, CA, and **Star Grading Services** (SGS) of Bellville, OH, were listed as "**Unacceptable**."

"This past October, PNG issued a consumer advisory about online auctions where many coins are listed as 'certified,' but not all authentication services use the same criteria for determining the grades of coins. We conducted a third survey as a continuing response to hobbyists' concerns about perceived wide variances in the grading standards between different rare coin certification services," said Robert Brueggeman, PNG Executive Director.[]

"As in 2002 and 2004, these 2006 survey results are being published solely as a service to the numismatic marketplace. The results do not necessarily reflect the views of PNG, ICTA or any particular PNG or ICTA member with respect to any particular grading service or services."

PNG and ICTA distributed surveys to its full-time professional members on November, 2006, but did not send duplicate surveys to people who belong to both organizations. Respondents sent their completed surveys to the certified public

accounting firm, BiggsKofford, of Colorado Springs, Colorado. A total of 129 qualified and verified surveys were tabulated by the CPA firm.

In the latest survey, participants were asked to rate the eleven grading services in these twelve categories with weighting factors (in parenthesis) disclosed in advance to survey participants:

• Accuracy of grading Mint State-60 and Proof-60 or higher (12%).
• Accuracy of grading About Good-3 to About Uncirculated-58 (12%).
• Accuracy of modern coin grading, 1965 to date (12%).
• Ability to detect altered, repaired, damaged, cleaned or counterfeit coins (12%).
• Grading guarantee (12%).
• Accuracy of all attributions including color, surface, varieties and mint errors (10%).
• Consistency of accurate grading (10%).
• Marketplace acceptance and availability of pricing for coins certified by the company (6%).
• Customer services and products provided by phone, print or on the Internet (4%).
• Collector benefits provided, such as population reports, registries and educational information (4%).
• Quality and security of the company's certified-coin holder (4%).
• Cost for certification services provided, considering price and turn-around time (2%).

Not all of the survey participants responded with respect to all 11 grading services, and some did not respond with respect to all 12 criteria. Other responses were not counted because the participants responded affirmatively to PNG/ICTA's request that they disclose any ownership or other affiliations they might have with particular grading services . . . .

(Doc. No. 37-4 at 2-3 (slight alterations to formatting).)

Plaintiffs allege that on September 17, 2007:

Defendant eBay, in complicity with Defendants, ANA and PNG, promulgated a new policy that created prohibitive standards under which coins sold via eBay may be listed as "certified" coins and a manner and method of designating coins that were not graded by the "approved" grading services as "counterfeit." The policy was recommended by the ANA and based on, among other things, the unfair and deceptive 2006 PNG/ICTA coin grading survey spearheaded by Stuppler. The policy permits only coins that have been graded by four grading services (NGC, PCGS, ICG, and ANACS) to be listed for sale on eBay as "certified" coins. Thus, coins graded by Plaintiffs, NNC and ACG[,] cannot be listed or sold on eBay as "certified" coins and are referred to as "counterfeit" by eBay. In fact, since the

institution of the aforementioned unfair and deceptive policy, dealers who have utilized eBay to list coins that are not graded by the "approved" grading services are notified directly by eBay that that [sic] the products are counterfeit.  The subject line of eBay's email to third-party dealers who have listed coins graded by Plaintiffs NNC and ACG unambiguously states, "eBay Listing Removed: Counterfeit Currency and Stamps." This policy, instead of preserving the vibrant and competitive free market, is abolishing it by prohibiting consumers and dealers from purchasing or dealing in certified coins graded from any coin grading service except for the four listed in eBay's policy.

(Doc. No. 37 ¶ 19 (internal citations omitted).)  Plaintiffs contend that the statements are false because the NNC and ACG coins are not counterfeit.  (*Id*. ¶ 20.)  Furthermore:

NNC and ACG are being damaged by such false statements due to the fact that coin dealers cannot list NNC and ACG coins as certified, which is a critical designation in numismatics. Given the lack of certification, eBay consumers will be under the false assumption that dealers who use NNC and/or ACG trade in counterfeit coins, and these consumers will either not purchase the coins at all or will only purchase the coins at a fraction of their true value. Furthermore, dealers will be less likely to send coins to NNC and/or ACG for certification for fear that their auctions will be cancelled and that their customers will assume that the dealer is trading in counterfeit coins. This damage is already occurring in the marketplace.

(*Id.* ¶ 20 (internal citations omitted).)

In addition, as alluded to above, Plaintiffs allege that dealers such as Treasure Gallery and Centsles are sent an email stating that their listings were "removed because it violated the eBay Counterfeit Currency and Stamps policy . . . . eBay does not permit the sale of currency that is improperly described, fraudulent or counterfeit." ( *Id.* ¶ 21.)  The subject line of this email is "eBay Listing Removed: Counterfeit Currency and Stamps." (*Id.* ¶ 19.) eBay also sends bidders an "email stating that the listing has been cancelled" which leaves "a reasonable reader with the understanding that Treasure Gallery's and Centsles['] NNC-graded and/or ACG-graded coins are counterfeit." (*Id.* ¶ 26.)  As a result, the dealers are left with thousands of coins that were graded by NNC and ACG and can no longer be sold on eBay.  (*Id.* ¶ 22.)

On September 18, 2007, ANA issued a press release summarizing the new eBay policy:

Yesterday, eBay launched a new policy in its Coins Category, which will ensure that any coins listed as certified must be certified by one of four grading companies.

"The ANA supports this effort to improve consumer protection for people buying and selling coins on eBay," said ANA President Barry Stuppler. "Although the ANA is not responsible for this policy, we support any effort to reduce the potential for fraud and to help safeguard the coin-collecting hobby."

The ANA has worked with eBay since September 2004, and through the Coins Community Watch group has assisted eBay in identifying misrepresented or fraudulent listings in the on-line auction company's coins category. During this period, the ANA emphasized to eBay the need to establish regulations designed to minimize the opportunity for consumer fraud.

"In order for consumer fraud to occur, three elements must be present: a person's desire, ability and opportunity to commit the fraud," said ANA Consumer Awareness Coordinator Susan McMillan, "We cannot control a person's desire or ability, but we can try to remove the opportunity."

In February 2007, eBay approached ANA for input on how best to address the issue of fraudulent grading and authenticating. The ANA provided eBay with input on possible guidelines and also provided them with the results of the PNG/ICTA 2006 Grading Services Survey.

In August, after much deliberation, the ANA recommended that eBay only go forward with the policy change if eBay would use the results of the PNG, lCTA 2006 Grading Service Survey. View the results of that survey at: http://www.pngdealers.com/public/pressreleases.cfm?article=47

Ultimately, eBay's determination on which grading services would qualify for the certified classification was solely an internal eBay policy decision," said acting Executive Director Kenneth Hallenbeck.

According to the new eBay policy, which eBay officials say is intended to improve buyer confidence, any listing of a "certified" coin must be certified by one of the following companies: Numismatic Guaranty Corp./Numismatic Conservation Services (NGC/NCS), Professional Coin Grading Service (PCGS), Independent Coin Grading (lCG), or ANACS.

Sellers will still be permitted to list coins graded by other grading services in other coin categories as long as they follow certain conditions.

Detailed requirements for listing certified coins can be accessed under the "Some Examples" section of eBay's "Selling Coins and Currency" policy page . . . .

(Doc. No. 37-14 at 2-3 (slight alterations to formatting).)[4]  Plaintiffs allege that the statements in the press release "are necessarily understood to refer to the Plaintiffs and permit the reasonable inference that [dealers who sell NNC and ACG graded coins] have availed themselves of the 'opportunity' to commit consumer fraud and are dealing in counterfeit coins." (Doc. No. 37 ¶ 23.) Plaintiffs contend that the press release further "permits the inference that Plaintiffs NNC and ACG are not reliable and accurate grading services and serve as mere vehicles for fraud." (*Id.*)

Plaintiffs allege that the "'certified coin' policy was enacted by eBay with the complicity of the ANA and PNG in that it arose from a history of prejudice and animosity on the part of the ANA (led by Stuppler) and PNG (led by Stuppler and [Steven] Ivy) against NNC, ACG, and any of the other smaller, more economical grading services." (*Id.* ¶ 27.) Plaintiffs further assert that:

> This prejudice and animosity began with the formation and operation of the "Internet [R]ules [C]ommittee" as discussed in paragraph 1, above, continued with the unfair and deceptive 2006 PNG/ICTA coin grading survey as discussed in paragraphs 18, 19 and 20 above, and culminated with the formation of the CCW and promulgation and enforcement of the "certified coins" policy, as discussed in paragraphs 15, 16 and 17 above, that was clearly and unequivocally based at least partially on the ANA's input and on the unfair and deceptive PNG/ICTA 2006 coin grading survey. (*Id.* ¶ 27.)

Plaintiffs also claim that, before September of 2007, Treasure Gallery and Centsles had sold thousands of ACG and NNC graded coins on eBay without any complaints regarding their authenticity. (*Id.* ¶ 28.) As a result of the new policy and the allegedly defamatory statements, "Plaintiffs have suffered and will continue to suffer substantial pecuniary injury and loss as well as

---

[4]  The remainder of the press release publishes two links to eBay's website and describes the ANA's mission. (Doc. No. 37-14.)

significant damage to their reputation in the coin industry among coin dealers and consumers . . .

. Defendants' conduct was undertaken willfully and was done with a malicious intent to harm the

Plaintiffs' reputations and to cause them severe economic injury." (*Id.* ¶¶ 29-30.)

## III.    Plaintiffs' Claims

Plaintiffs assert three claims.  In Count I, entitled "Civil Conspiracy to Commit Trade Libel,"

Plaintiffs allege that:

> Defendants have combined, confederated, conspired, and agreed to make false and
> disparaging statements concerning Plaintiffs, as set forth above, in an effort to injure
> the Plaintiffs in their occupation, business, and employment and to expose them to
> distrust, hatred, contempt and ridicule and to cause them to be avoided.
>
> Subsequent to entering into the conspiracy, these Defendants made or caused to be
> made the false and disparaging statements set forth above in paragraphs 17-21 and
> 23-25 that constituted overt acts in furtherance of the conspiracy.

(*Id.* ¶¶ 34-35.)  In Count II,[5] entitled "Trade Libel Against eBay and the ANA," Plaintiffs allege that

the following statements were defamatory: (1) the September 18, 2007 ANA press release which

summarizes eBay's policy regarding the sale of certified coins (*Id.* ¶ 39); and (2) "malicious emails

published by eBay" concerning listings that were removed for violating the "Counterfeit Currency

and Stamp Policy." (*Id.* ¶¶ 40- 41.)  Plaintiffs allege that "Defendants knew, or should have known"

that the statements were false but nevertheless published the statements "with actual malice." (*Id.*

¶¶ 42, 45.)

Finally, in Count Three, entitled "Unfair and Deceptive Trade Practices," Plaintiffs allege

that:

> Defendants have engaged and continue to engage in unfair and deceptive trade
> practices in the conduct of trade and business as described in paragraphs 17-21 and

---

[5]    Count II is not brought against PNG.

23-29 above, in violation of Florida Statutes, § 501.204(1) . . . . Defendants conduct, (*sic*) as described above, has been and is likely to deceive and mislead consumers and coin dealers to their detriment into believing that coins that are graded by ACG and/or NNC are fraudulent or counterfeit, which is entirely false.

(*Id.* ¶¶ 52-53.)  Plaintiffs contend that the "practices" injure consumers because they raise the price of coins by forcing sellers to use more expensive grading services.  (*Id.* ¶¶ 53-54.)

All three Defendants have moved to dismiss Plaintiffs' claims.  PNG moves to dismiss under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, under Rule 12(b)(3) for improper venue, and under Rule 12(b)(6) for the failure to state a claim upon which relief can be granted.  ANA and eBay also move for dismissal under Rule 12(b)(6).

## Standards of Review

### I.  Personal Jurisdiction

The plaintiff bears the burden of establishing a prima facie case of personal jurisdiction. *Stubbs v. Wyndham v. Nassau Resort & Crystal Palace*, 447 F.3d 1357, 1360 (11th Cir. 2006) (citing *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1268-69 (11th Cir. 2002)).  "A prima facie case is established if the plaintiff presents enough evidence to withstand a motion for directed verdict." *Id.* (quoting *Meier*, 288 F.3d at 1269) (citations and internal quotations omitted). When the defendant "submits affidavits contrary to the allegations in the complaint, the burden shifts back to the plaintiff to produce evidence supporting personal jurisdiction, unless the defendant's affidavits contain only conclusory assertions that the defendant is not subject to jurisdiction." *Id.* Where conflicts exist between the various affidavits, a court must construe all reasonable inferences in favor of the plaintiff. *Id.*

## II.     Venue

On a Rule 12(b)(3) motion to dismiss, the plaintiff has the burden of showing that venue in its chosen forum is proper.  *Gulf Power Co. v. Coalsales II, LLC,* No. 3:06cv270/MCR, 2008 WL 563484, at *5 (N.D. Fla. Feb. 27, 2008) (citing *Wai v. Rainbow Holdings*, 315 F. Supp.2d 1261, 1268 (S.D. Fla. 2004)); *Brown v. Brown*, No. 8:06-CV-1028-T-24TGW, 2007 WL 949424, at * 2 (M.D. Fla. Mar. 27, 2007).  In considering a motion under Rule 12(b)(3), a court accepts the facts in the plaintiff's complaint as true.  *Wai*, 315 F. Supp. 2d at 1268.  A court may also "consider matters outside the pleadings if presented in proper form by the parties."  *MGC Commc'ns, Inc. v. BellSouth Telecomms., Inc.*, 146 F. Supp. 2d 1344, 1349 (S.D. Fla. 2001) (citing 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1364 (2d ed.1990)).  Where there is a conflict between allegations in the complaint and evidence outside the pleadings, the court "must draw all reasonable inferences and resolve all factual conflicts in favor of the plaintiff." *Wai*, 315 F. Supp. 2d at 1268.

## III.     Failure to State a Claim

When ruling on a motion to dismiss for failure to state a claim upon which relief may be granted under Federal Rule of Civil Procedure 12(b)(6), a court must view the allegations of the complaint in the light most favorable to the plaintiff, consider the allegations of the complaint as true, and accept all reasonable inferences drawn from the complaint.  *E.g.*, *Jackson v. Okaloosa County*, 21 F.3d 1531, 1534 (11th Cir. 1994); *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) (abrogated on other grounds).  The court must limit its consideration to this pleading and the written instruments attached to it as exhibits.  Fed. R. Civ. P. 12(d); *GSW, Inc. v. Long County*, 999 F.2d 1508, 1510 (11th Cir. 1993).  Once a claim has been stated adequately, it may be supported by

showing any set of facts consistent with the allegations of the complaint.  *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1969 (2007).

## Analysis

**I.      PNG's Motion to Dismiss[6]**

**A.      Personal Jurisdiction**

In a diversity case, personal jurisdiction over a defendant must be authorized by the law of the state in which the federal court sits and be consistent with the Federal Constitution.  *Stubbs*, 447 F.3d at 1360.  Thus, the first question in this case is whether PNG's activities are sufficient to subject it to personal jurisdiction under Florida's long-arm statute.  *Id.*

**1.      Statutory Jurisdiction Under Florida's Long Arm Statute**

As a conceptual matter, personal jurisdictional can arise either "specifically or generally" from a defendant's contacts with the forum state.  *Id.* at 1360 n.3.  General jurisdiction often arises from contacts with the forum that are not directly related to the cause of action being litigated, while specific jurisdiction must be founded on activities in the forum that are related to the cause of action at issue.  *Id.*  Thus, if a defendant is subject to the general jurisdiction of the court, the defendant must respond in that court to any cause of action, regardless of where the cause of action arose.  *Id.* This distinction between general and specific jurisdiction plays an important role in both the statutory and constitutional limits on personal jurisdiction.  *See id.*

In this case, Florida's long-arm statute provides ten grounds on which personal jurisdiction may be asserted over a non-resident defendant.  Fla. Stat. § 48.193 (2007).  Eight of these grounds

---

[6]      The Court will analyze each of the Motions to Dismiss in the order in which they were filed.  However, a number of the pleadings and substantive argument on the issues raised by the motions overlap.

are examples of "specific jurisdiction," requiring the cause of action to "aris[e]" out of particular acts of the defendant which are connected in some way to the state of Florida. *Id.* § 48.193(1)(a)-(h).  Of these eight provisions, Plaintiffs specifically rely on subsection (1)(b), which provides personal jurisdiction over a Defendant who committed "a tortious act within this state." *Id.* § 48.193(1)(b).  The statute's ninth ground for jurisdiction provides personal jurisdiction over "a defendant who is engaged in substantial and not isolated activity within this state, whether such activity is wholly interstate, intrastate, or otherwise . . . whether or not the claim arises from that activity." *Id.* § 48.193(2).  Thus, subsection (2) allows the district court to assert "general" personal jurisdiction over a defendant "who has substantial and not isolated activity within Florida, even when that activity is unrelated to the cause of action being litigated." *Stubbs*, 447 F.3d at 1361 (internal quotations and citations omitted).[7]  The Florida Supreme Court has construed subsection (2) to provide jurisdiction when the actions of the defendant, "considered collectively[,] . . . show a general course of business activity in the State for pecuniary benefit." *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 627 (11th Cir. 1996) (quoting *Dinsmore v. Martin Blumenthal Assocs., Inc.*, 314 So. 2d 561, 564 (Fla. 1975)).[8]

Thus, Plaintiffs allege that the long-arm statute provides personal jurisdiction on two grounds.  First, Plaintiffs allege that PNG has "more than isolated business in Florida," subjecting

---

[7]     The "substantial and not isolated activity" requirement of the long-arm statute has been recognized by Florida courts as the functional equivalent of the "continuous and systematic contact" requirement for general jurisdiction under the Fourteenth Amendment's Due Process Clause.  *Stubbs*, 447 F.3d at 1363 n.7.

[8]     The tenth ground for jurisdiction applies only when the defendant has waived its jurisdictional challenge by asserting a counterclaim in the case where jurisdiction is challenged. *Id.* § 48.193(4).  This ground is not implicated here.

it to general jurisdiction.  (Doc. No. 37 ¶ 7(a)-(h).)[9]  Second, Plaintiffs allege that PNG "committed

a tortious act within this State," subjecting it specific jurisdiction.  (*Id.* ¶ 7.)  The Court will analyze

both bases for jurisdiction in turn.

### a.   General Jurisdiction

Plaintiffs' Amended Complaint lists eight examples of PNG's business activities in Florida:

(a) PNG has 17 coin dealers located in Florida listed on its website as PNG dealers. These 17 coin dealers are all representatives or agents of PNG. Attached as Exhibit "A" is a true and correct copy of a printout from PNG's website;

(b) PNG filed a press release on May 5, 2004 stating that it "intended to make arrangements for programs and seminars at the Florida United Numismatists convention in Orlando in January." Attached as Exhibit "B" is a true and correct copy of the press release.

(c) PNG has previously been sued in the Middle District of Florida (6:05-cv-1285-Orl-18DAB);

(d) PNG and ICTA announced and published the results of a 2006 grading service survey, which was published on Barry Stuppler's website at www.stuppler.com and PNG's website at www.pngdealers.com, which indicates that it originated from Orlando, Florida. Attached as Exhibits "C" and "D" respectively are true and correct copies of the surveys published on each website;

[e] PNG held and attended a general membership meeting in Orlando, Florida on January 9, 2008 and its general membership meeting is held annually in Orlando. Attached as Exhibit "E" is a true and correct copy of an article regarding the meeting;

[f] Gary Adkins, the president of PNG was served with the Complaint in this action in Orlando, Florida on January 10, 2008 at the Florida United Numismatists Convention, which is a convention that PNG attends every year and is located in Orlando, Florida every year. Attached as Exhibit "F" is a true and correct copy of the affidavit of service;

---

[9]      Plaintiffs mistakenly labeled two sub-paragraphs as "(d)." To avoid confusion, the Court has assigned new labels to the sub-paragraphs.

[g] PNG conducted its "share the knowledge education seminar" at the Florida United Numismatists Convention in January of 2008. Attached as Exhibit "G" is a true and correct copy of a printout of the article; and

[h] PNG has a website at www.pngdealers.com which is accessible to every internet-connected computer in the forum state and therefore has purposefully availed itself of the privilege of doing business in the state of Florida.

(*Id.* ¶ 7(a)-(h).)   PNG contends that these eight allegations are insufficient to confer personal jurisdiction over it.   (Doc. No. 40 at 5-6.)   Plaintiffs respond that three of these allegations in particular, subparagraphs (a), (d), and (h), are sufficient to establish general personal jurisdiction. (Doc. No. 45 at 5-12.)

Defendants are correct.   First, Plaintiffs' heavy reliance on PNG's seventeen Florida-based "coin dealers" is misplaced.   Plaintiffs are correct that both a corporation's direct contacts and the contacts of its agents are relevant to the existence of personal jurisdiction under section 48.193(2). *See Stubbs*, 447 F.3d at 1361-63 (aggregating the direct and subsidiary-related contacts of a non-resident corporation).   However, in a general jurisdiction analysis, the actions of a subsidiary or agent are not automatically attributed to the parent corporation.   *Id.* at 1362.   The agent's actions will be attributed to the parent for purposes of aggregating contacts only when "the subsidiary is merely an agent through which the parent company conducts business in a particular jurisdiction or its separate corporate status is formal only and without any semblance of individual identity . . . ." *Id.* (quoting *Meier*, 288 F.3d at 1272); *see also Consol. Dev. Corp. v. Sherrit, Inc.*, 216 F.3d 1286, 1293 (11th Cir. 2000).[10]

---

[10]      The Eleventh Circuit has further explained that the district court "may extend jurisdiction to any foreign corporation where the affiliated domestic corporation manifests no separate corporate interests of its own and functions solely to achieve the purpose of the dominant corporation."   *Stubbs*, 447 F.3d at 1362.   One specific test asks whether the nonresident corporation

(continued...)

Plaintiffs assert that the dealers are PNG's agents because PNG has created the appearance of an agency relationship through its "strict policies regarding membership, its arbitration procedure, the fact that its members use its trademark on their website and for various other reasons . . . ." (Doc. No. 45 at 7.) Even if it were correct,[11] Plaintiffs' conclusion would not be dispositive.  Unlike the case law Plaintiffs cite in support of their argument, this is not a case where the Plaintiffs are seeking to establish specific personal jurisdiction over the principal for the *agent's* tort.  *C.f.*, *Meterlogic, Inc. v. Copier Solutions, Inc.*, 126 F. Supp. 2d 1346, 1354 (S.D. Fla. 2000) (utilizing an agency analysis to determine whether the torts of a subsidiary could be imputed to the parent for purposes of establishing specific jurisdiction).  Rather, Plaintiffs are attempting to aggregate the agents' contacts for purposes of establishing general personal jurisdiction over the principal.  As such, Plaintiffs must not only demonstrate the existence of an agency relationship, but they must also establish a reason to impute the agents' contacts to the principal.  *Stubbs*, 447 F.3d at 1361-63.  The allegations in Plaintiffs' Amended Complaint are insufficient to meet this standard.  Critically, Plaintiffs have not shown that PNG uses its agents to conduct business in Florida.  If anything, the

---

[10](...continued)
would perform the equivalent services if its domestic subsidiaries did not exist.  *Id.* at 1363 (citing *Wiwa v. Royal Dutch Petrol. Co.*, 226 F.3d 88, 95 (2d Cir. 2000)).  While these cases concern subsidiary corporations acting for the benefit of their parent corporations, they appear to be applicable here because Plaintiffs argue that PNG's seventeen florida-based coin dealers acted as local subsidiaries of the foreign corporation.

[11]    Under Plaintiffs' logic, members of most professional associations, including bar associations and medical boards, would be "agents"of the association.  The purpose of membership in these associations is to benefit the individual members and the profession as a whole.  *See* Black's Law Dictionary 727 (8th ed. 2004) (defining "guild" as a "group of persons sharing a common vocation who unite to regulate the affairs of their trade in order to protect and promote their common vocation . . . .").   The need to establish "strict policies regarding membership" is generally for the purpose of creating minimum qualifications, thereby promoting consumer confidence in the members.  *See id.*  Such a metric of control is not consistent with the concept of agency because the agents, not the principal, benefit from the control.

allegations and attached exhibits suggest that PNG's activities are conducted for the benefit of its members.  (*See* Doc. No. 45-9 at 1 (explaining that PNG "provides an umbrella of protection for you and your customers").)

Second, PNG's annual general membership meeting in Orlando, Florida and its maintenance of a website that is accessible from Florida are insufficient to establish "continuous and systematic business" in Florida.  Plaintiffs stress that PNG "attends the Orlando F.U.N. [Florida United Numismatists] Show *every year* and holds its meetings their [sic] *every year*."  (Doc. No. 45 at 11 (emphasis in original).)  Although the conducting of meetings in the forum state is one of many types of contacts that may be aggregated for purposes of establishing general jurisdiction, *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 447-48 (1952), annual meetings, without more, appear to be the type of "isolated activity" that do not satisfy Florida's long arm statute.  *See* Fla. Stat. § 48.193(2).  Furthermore, Plaintiffs concede that PNG's website is "passive" and does not specifically solicit business from Floridians.  *C.f., Zippo Mfg. Co v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1125-26 (W.D. Pa. 1997).  Although PNG's website provides links to the websites of various PNG members which Plaintiffs describe as "active or interactive website[s]," Plaintiffs do not explain how the linking of one website to another amounts to a "contact" with the state where the subject of the linked website is based.

Accordingly, the Court finds that it lacks general personal jurisdiction over PNG.[12]

---

[12]     Because Plaintiffs' allegations are insufficient to establish general personal jurisdiction over PNG, it is unnecessary to consider the affidavits that PNG has provided to rebut Plaintiffs' allegations of general jurisdiction.

### b.      Specific Jurisdiction

Plaintiffs also argue that specific jurisdiction exists over PNG because it committed a tort in Florida.  In particular, Plaintiffs argue that PNG "announced" the results of the 2006 grading survey from Orlando, Florida.  (Doc. No. 40 at 4-5.)  Plaintiffs also argue that the "Eleventh Circuit has interpreted Florida's long arm statute to mean that a defendant who commits a tort that causes injury in Florida is subject to personal jurisdiction, no matter where the act that caused the injury was actually completed."  *Id.* (citing *Benedict v. Gen. Motors Corp.*, 142 F. Supp. 2d 1330 (N.D. Fla. 2001); *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1216-17 (11th Cir. 1999)).

Plaintiffs are correct that Florida's long arm statute "applies to defendants committing tortious acts outside the state that cause injury in Florida."  *Posner*, 178 F.3d at 1217.  But neither the Florida Supreme Court nor the Eleventh Circuit has interpreted the long-arm statute to *automaticall*y provide personal jurisdiction over a defendant who is alleged to tortiously cause an injury in Florida.  In this sense, Plaintiffs' summary of the Eleventh Circuit's case law is imprecisely broad.  As described below, the statute has been given a slightly more nuanced construction.

The Florida Supreme Court has held in certain contexts that the long arm statute applies to defendants who were not physically present in the state of Florida but took tortious actions directed toward the state and which caused injury in the state.  *Wendt v. Horrowitz*, 822 So. 2d 1252, 1258 (Fla. 2002) (holding that an attorney who allegedly gave negligent advice over the telephone to a client in Florida was subject to specific jurisdiction despite not being physically present in Florida); *Execu-Tech Bus. Sys., Inc. v. New Oil Paper Co., Ltd.*, 752 So. 2d 582, 585 (Fla. 2000) (holding that a defendant who allegedly engaged in a conspiracy to fix the price of paper which had the effect of raising the price of paper sold in Florida was subject to specific jurisdiction even though the

company had no physical presence in Florida).  In addition, the Eleventh Circuit has applied the long-arm statute in similar contexts.  *Posner*, 178 F.3d at 1216 (holding that a Pennsylvania corporation was subject to personal jurisdiction in Florida because it interfered with a Floridian's contract with a Bahamian insurance company); *Robinson v. Giamarco & Bill, P.C.*, 74 F.3d 253, 257 (11th Cir. 1996) (holding that out-of-state attorneys were subject to personal jurisdiction in Florida for negligently drafting a will that injured the estate of a Florida resident).  It is unclear from these cases whether the statute requires the defendant to have some level of knowledge that its actions would cause injury in Florida, and if so, what level of knowledge is required.[13]  However, as a general matter, courts interpreting subsection (1)(b) of the long-arm statute have routinely found personal jurisdiction over foreign defendants who committed intentional torts outside of Florida that caused injuries inside Florida.  *See Robinson*, 74 F.3d at 257 n.2 (summarizing Florida intermediate appellate cases).

Here, PNG is alleged to have (1) engaged in a conspiracy to defame four companies located in Florida and (2) violated the FDUTPA by creating a "deceptive" survey regarding the ACG's and NNC's grading services, causing injury to Florida businesses and consumers.  Both claims allege intentional tortious activity with resulting injuries in Florida.  Accordingly, under the case law interpreting Florida's long-arm statute, Plaintiffs' allegations are sufficient to establish specific personal jurisdiction over PNG.[14]

---

[13]    In certain circumstances, the constitutional analysis requires the defendant to have some level of knowledge that it will cause an injury in the forum state.  This distinction is explained below.  *See*, *infra,* at 24-25.

[14]    PNG's rebuttal affidavits solely concern Plaintiffs' claim that PNG is subject to general personal jurisdiction.  (*See* Doc. Nos. 40-2, 40-3.)  PNG has not offered affidavits rebutting Plaintiffs' allegations of specific personal jurisdiction.

## 2. Constitutionality of Asserting Personal Jurisdiction over PNG

The exercise of personal jurisdiction over a defendant must always comport with the requirements of due process under the Federal Constitution. *Posner*, 178 F.3d at 1221. In diversity cases, federal courts typically analyze the sufficiency of the defendant's contacts with the forum state under the Fourteenth Amendment, unless a federal statute or rule of procedure directs the court to examine the defendant's contacts with the United States as a whole. *Conner v. N.Y. Times Co.*, 310 F.2d 133, 134-35 (5th Cir. 1962) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938));[15] *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 227 (2d Cir. 1963) (Friendly, J.) *quoted in Alexander Proudfoot Co. World Headquarters v. Thayer*, 877 F.2d 912, 918 (11th Cir. 1989). Because no statute or rule directs this court to analyze PNG's contacts on a nationwide scale, jurisdiction is acceptable in this case "so long as 'minimum contacts' exist between [PNG] and Florida and exercising jurisdiction does not offend 'traditional notions of fair play and substantial justice.'" *Posner*, 178 F.3d at 1221 (quoting *Robinson*, 74 F.3d at 258-59).

### a. Minimum Contacts

The Eleventh Circuit has instructed the district courts to utilize a three-part test when evaluating the sufficiency of a defendant's minimum contacts with the forum state:

> First, the contacts must be related to the plaintiff's cause of action . . . . Second, the contacts must involve some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum. Third, the defendant's contacts with the forum must be such that the defendant should reasonably anticipate being haled into court there.

---

[15] The Eleventh Circuit Court of Appeals adopted as binding precedent all prior decisions of the former Fifth Circuit Court of Appeals issued prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

*Id.* (quoting *Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1546 (11th Cir. 1993)).  Plaintiffs'

entire argument with respect to the minimum contacts requirement is as follows:

> Under either specific or general [jurisdiction], due process is satisfied in the instant
> case . . . . Under specific jurisdiction, PNG attends the Orlando FUN show and holds
> its general membership meeting at the FUN show every year. At this year's meeting,
> it announced the results of the PNG/ICTA survey. Based on the fact that the results
> of this survey provide disparaging comments about the Plaintiffs and the fact that a
> similar previous survey was the basis of a lawsuit between similar parties, PNG
> could reasonably anticipate being haled into court in this forum.

(Doc. No. 45 at 13.)  The argument fails to address the Eleventh Circuit's  three requirements for

evaluating minimum contacts.   Under the first two prongs of the test, PNG must purposefully direct

itself toward Florida in a manner that implicates the relevant minimum contacts which give rise to

specific personal jurisdiction.  *Posner*, 178 F.3d at 1221; *see also Keeton v. Hustler*, 465 U.S. 770,

774 (1984); *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).  As the Eleventh Circuit has explained,

"[t]his requirement assures that a defendant will not be haled into a jurisdiction as a result of

random, fortuitous, or attenuated contacts . . . ."[16]  *Robinson*, 74 F.3d at 258 (citing *Burger King v.

Rudzewicz*, 475 U.S. 462, 475 (1985)); *see also Hanson*, 357 U.S. at 253.  Under the third prong,

PNG's contacts must be sufficient for it to reasonably anticipate being subjected to legal proceedings

in Florida.  *Posner*, 178 F.3d at 1221.  The requirements are met with respect to some, but not all,

of Plaintiffs' claims.

Plaintiffs' attempt to cast PNG's attendance of the "Orlando FUN" show and issuance of a

press release with an Orlando, Florida byline concerning results of the allegedly deceptive survey

---

[16]      This reasoning appears to be consistent with the Florida Supreme Court's decisions.
For example, in *Execu-Tech*, the Florida Supreme noted that the Japanese defendant had "sought
to use the benefits afforded by Florida law" by creating a price fixing scheme which utilized the
state's market. *Execu-Tech*, 752 So. 2d at 585.  Thus, the defendant purposefully availed itself of
the Florida market in way that was relevant to the allegedly tortious behavior.

as minimum contacts that are related to their causes of action.   However, the contacts are only

superficially related to conduct that gave rise to this lawsuit.   The allegations in the Amended

Complaint and attached exhibits explain that PNG attended a trade show in Orlando, Florida at

which it issued a press release concerning the 2006 survey.   (Doc. No. 37 ¶ 7.)   Plaintiffs do not

allege that the press release itself was defamatory.   Moreover, as the Amended Complaint is drafted,

Plaintiffs' injuries are in no way linked to PNG's attendance at the convention in Florida or the

byline of the press release in Orlando, Florida.   Thus, PNG's attendance of the FUN show and the

Orlando byline are merely "random, fortuitous, or attenuated contacts."   Likewise, the fact that a

previous survey was the subject of a lawsuit by "similar parties" is not a minimum contact relevant

to this case.   *United States v. Subklew*, No. 003518CIVGRAHAM, 2001 WL 896473, at *3 (S.D.

Fla. June 5, 2001).

Although not specifically cited by Plaintiffs as a relevant "minimum contact," the Court must

also determine whether PNG's alleged intention to cause an injury in Florida is sufficient to satisfy

the minimum contacts test.   In *Calder v. Jones*, 465 U.S. 783 (1984), the United States Supreme

Court held that two Florida magazine editors could be subject to personal jurisdiction in California,

consistent with the Fourteenth Amendment, for a libelous article written about a entertainer in

California.   *Id.* at 789.   The Court held that "California is the focal point both of the story and of the

harm suffered.   Jurisdiction over petitioners is therefore proper in California based on the 'effects'

of their Florida conduct in California."   *Id.*  (citing *World-Wide Volkswagen Corp. v. Woodson*, 444

U.S. 286, 297-298 (1980)).   The Court further concluded, "an individual injured in California need

not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause

the injury in California."   *Id.*

*Calder* has been distinguished and narrowed by various federal appellate courts, including the Eleventh Circuit.  *See Rhodes v. Unisys Corp.*, 170 F. App'x. 681, 685 (11th Cir. 2006) ("The *Calder* effects test is a lens through which the connectivity between defendant, cause of action, and forum state may be viewed . . . . A single email contact with a forum, especially when the email is unrelated to the causes of action, will not provide a basis for personal jurisdiction."); *see also Air Prods. & Controls, Inc. v. Safetech Intern., Inc.*, 503 F.3d 544, 552 (6th Cir. 2007) ("The Sixth Circuit, as well as other circuits, have narrowed the application of the *Calder* 'effects test,' such that the mere allegation of intentional tortious conduct which has injured a forum resident does not, by itself, always satisfy the purposeful availment prong."); *Cas. Assur. Risk Ins. Brokerage Co. v. Dillion*, 976 F.2d 596, 599 (9th Cir. 1992) (noting that about 600,000 copies of the allegedly libelous magazine in *Calder* had been sold in California, strengthening the conclusion that the *Calder* defendants knew that their activities would cause harm there); *see also Internet Solutions Corp. v. Marshall*, No. 6:07-cv-1740-Orl-22KRS, 2008 WL 958136, at *4 (M.D. Fla. Apr. 8, 2008) (distinguishing *Calder* in an internet libel case, in which the parties presented affidavits relating to jurisdiction, because there was no evidence that the libelous statement was posted with an intent to inflict injuries in Florida or was otherwise related to Florida).

Here, however, *Calder* is controlling because Plaintiffs allege that PNG intended to cause injuries to NNC and ACG, both of which are based in Florida, and PNG has not yet introduced any affidavits contradicting this allegation.  (*See* Doc. No. 37 ¶ 27 (explaining that PNG helped form the certified coin policy in an attempt to put "smaller, more economical grading services" generally, and NNC and ACG specifically, out of business)).  Drawing all reasonable inferences in favor of Plaintiffs, it can be inferred from the Amended Complaint that PNG knew that it would cause an

-24-

injury to NNC and ACG in Florida.   Thus, as the record currently stands, specific personal jurisdiction over PNG is constitutionally permissible under the Fourteenth Amendment for NNC's and ACG's claims against PNG.   *See Ruiz de Molina v. Merrit & Furman Ins. Agency*, 207 F.3d 1351, 1358 (11th Cir. 2000) (finding personal jurisdiction over a non-resident defendant where the defendant had no "direct contacts" with the forum state but was alleged to have knowingly committed an intentional tort with injuries resulting in the forum).

However, the Amended Complaint does not allege sufficient facts to infer that PNG had any level of knowledge that its conduct would cause injuries to Treasure Gallery or Centsles in Florida.[17] In fact, there is nothing in the Amended Complaint or attached exhibits to suggest that PNG even knew that these dealers existed and sold coins that were graded by NNC and ACG.  Accordingly, PNG's minimum contacts with Florida are sufficient with respect to the claims asserted by NNC and ACG only.

### b.      Traditional Notions of Fair Play and Substantial Justice

Even after sufficient minimum contacts are shown, a defendant is not subject to personal jurisdiction unless the assertion of jurisdiction would be consistent with traditional notions of fair play and substantial justice.[18]  According to the Eleventh Circuit, this concern may be addressed by analyzing the following factors:

---

[17]      *Calder* permitted the assertion of specific personal jurisdiction under the effects test when the defendant intends to cause an injury in the forum; however, it did not explain whether lesser levels of knowledge are also sufficient to justify specific jurisdiction.  *See Dillion*, 976 F.2d at 599-600 (determining whether jurisdiction was acceptable based on an injury in the forum where the defendant did not send any defamatory communications to the forum).

[18]      Although Plaintiffs and PNG both cite the applicable law in their submissions, neither the Motion to Dismiss nor the Response actually applies the legal standard to the facts of this case.

[1] The burden on [the defendant] of defending the suit in Florida; [2] Florida's interest in adjudicating the suit; [3] [the plaintiff's] interest in obtaining effective relief; [4] the interests of the interstate judicial system in using resources efficiently; and [5] the interests of the states in furthering shared substantive policies.

*Posner*, 178 F.3d at 1222.  Here, the burden on PNG to litigate in Florida cannot be viewed as too substantial because PNG has previously traveled to the forum to attend a trade show.  *See Posner*, 178 F.3d at 1221; *Roth v. Garcia Marquez*, 942 F.2d 617, 623 (9th Cir. 1991).  Moreover, air travel has substantially lessened the burden associated with coast-to-coast travel.  *E.g.*, *Posner*, 178 F.3d at 1221; *see also Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1199 (9th Cir. 1988).  Because Plaintiffs are Florida residents, Florida has a relatively strong interest in providing redress to its citizens.  *Compare Benitez-Allende v. Alcan Aluminio Do Brasil, S.A.*, 857 F.2d 26, 30 (1st Cir. 1988) (finding in a products liability case that the forum had an interest in protecting its citizens from injuries caused by defective products made by an overseas producer), *with Asahi*, 480 U.S. at 114 ("Because the plaintiff is not a California resident, California's legitimate interests in the dispute have considerably diminished.").  Likewise, Plaintiffs' interest in obtaining "effective relief" militates toward jurisdiction in Florida because Plaintiffs are Florida residents.  *See Asahi*, 480 U.S. at 114.  The efficient use of resources prong points in no particular direction because Plaintiffs have not alleged with any specificity where the tortious behavior occurred or where evidence can be found.  *See id.* (noting that the transaction between the plaintiff and defendant companies occurred in Taiwan, and that the companies shipped products between Japan and Taiwan, rather than in the forum).  Finally, neither party has demonstrated that the "interests of the states in furthering shared substantive policies" points in one direction or another.  *Posner*, 178 F.3d at 1221.[19]  Accordingly,

---

[19]     This prong of the test appears to be most relevant when the sovereignty of a state or
(continued...)

because all factors are either neutral or weigh in favor of jurisdiction, the exercise of personal

jurisdiction over PNG for ACG's and NNC's claims is consistent with the Fourteenth Amendment.

### B.    Venue

Title 28 U.S.C. section 1391(a) provides that:

> A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in . . . (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

See also Brown, 2007 WL 949424, at * 2.    "A [corporate] defendant is a resident of a judicial

district if it is subject to personal jurisdiction there at the time the case is initiated." Algodonera De

Las Cabezas, S.A. v. Am. Suisse, 432 F.3d 1343, 1345 (11th Cir. 2005) (citing 28 U.S.C. § 1391(c)).

Because PNG is subject to personal jurisdiction in the Middle District of Florida with respect to

ACG's and NNC's claims, venue is proper in the Middle District of Florida for these claims.  28

U.S.C. § 1391(a)(1).[20]

---

[19](...continued)
foreign country is implicated by the exercise of jurisdiction by the forum state. See Asahi, 480 U.S. at 115; World-Wide Volkswagen Corp., 444 U.S. at 293; Kulko v. Superior Court of Cal. in and for the County of San Francisco, 436 U.S. 84, 92 (1978).  The parties have not presented any argument, and the Court is unaware of any reason, why the assertion of jurisdiction by a Florida court would injure another state's sovereignty in this case.

[20]    PNG has not presented any argument concerning its specific contacts with the Middle District of Florida, versus Florida as a whole.  However, the allegations in the Amended Complaint suggest that PNG's contacts with the Middle District are sufficient to make it a resident of the district under section 1391(c).

C.      **Failure to State a Claim**

PNG lodges a number of pleading based and substantive challenges to Plaintiffs' Amended

Complaint, some of which are echoed by ANA and eBay in their Motions to Dismiss.  The Court

will analyze each ground for dismissal in turn.

1.      **Compliance with Federal Rules of Civil Procedure 8(a)(2), 9(b), and 10(b)**

PNG argues that Plaintiffs have violated several pleading rules, first taking issue with

Plaintiffs' description of the survey as "unfair and deceptive."  According to PNG, "[b]ecause the

allegation that the survey of coin dealers was unfair and deceptive and the results of the survey

illegitimate [sic] are merely conclusory allegations unsupported by facts, Counts I and III fail to

comply with Rule 8(a)(2) and must be dismissed."  (Doc. No. 40 at 16.)  PNG also argues that

claims under the FDUTPA must satisfy the heightened pleading standards of Rule 9(b), and

Plaintiffs have failed to do so because they "lump together all of the defendants . . . ."  (Doc. No. 40

at 18.)  Moreover, PNG contends that "lumping together . . . all defendants also violates the clarity

objectives of the separate paragraph requirement of Rule 10(b)."  (*Id.*)  Finally, PNG argues that

allegations of fraudulent conduct based on "information and belief" must set forth the facts upon

which the belief is founded.  (*Id.* at 18-19.)

PNG's pleading objections are mostly without merit.  Although conclusory allegations are

ignored for purposes of evaluating the sufficiency of a plaintiff's claims, such allegations do not

condemn the entire pleading.  Here, Plaintiffs allege that the survey was "illegitimate" and "false."

(Doc. No. 37 ¶ 17.)  Plaintiffs also allege that the survey solicited opinions about ACG from dealers

who never had dealt with ACG coins and ignored the positive comments of those who had. (*Id.*)  The

gist of the allegation is that PNG concocted the results of the survey to damage smaller grading

companies. (*Id.*) Accordingly, PNG is on notice of the substance of Plaintiffs' claims, and the basic notice requirement of Rule 8(a) is satisfied.

PNG's argument concerning the purported "lumping together" of defendants is also unpersuasive. PNG is correct that courts sometimes require claims under the FDUTPA to meet the heightened pleading requirements of Rule 9(b).[21] *Stires v. Carnival Corp.*, 243 F. Supp. 2d 1313, 1322 (M.D. Fla. 2002); *Fla. Digital Network v. N. Telecom, Inc.*, No. 6:06-cv-889-Orl-31-JGG, 2006 WL 2523163, at *2 (M.D. Fla. Aug. 30, 2006). However, even if Rule 9(b) applies to the claims in this case, Plaintiffs' allegations do not run afoul of Rule 9(b) by "lumping" the Defendants together. Although many of the Amended Complaint's fifty-nine paragraphs mention more than one defendant, they do so in the context of a narrative. Importantly, the Amended Complaint specifies how each Defendant engaged in an allegedly unfair and deceptive act. By doing so, the Amended Complaint satisfies the specificity requirements of Rule 9(b) and puts Defendants on sufficient notice of their roles in the scheme. Moreover, because the allegations are sufficiently clear as pled, PNG's contention that each paragraph must not mention more than one defendant would do nothing more than multiply the number of paragraphs in the Amended Complaint.

Similarly, the Amended Complaint does not violate the "clarity objectives" of Rule 10(b). The Eleventh Circuit has explained that:

> [Rules 8 and 10 work together] to require the pleader to present his claims discretely and succinctly, so that his adversary can discern what he is claiming and frame a responsive pleading, the court can determine which facts support which claims and whether the plaintiff has stated any claims upon which relief can be granted, and, at trial, the court can determine that evidence which is relevant and that which is not.

---

[21]     PNG fails to explain how the claim of conspiracy to commit trade libel is "grounded in fraud." (*See* Doc. No. 40 at 17.)

*Fikes v. City of Daphne*, 79 F.3d 1079, 1082 (11th Cir.1996) (citation omitted).  As explained above, Plaintiffs' method of pleading is sufficiently clear and satisfies this standard.

Finally, PNG is similarly unpersuasive in arguing that Plaintiffs violate Rule 9(b) by making allegations based on "information and belief."  Plaintiffs make allegations upon "information and belief" three times in the Amended Complaint.  (Doc. No. 37 ¶¶ 11, 13, 16.)  The first allegation concerns their estimation of eBay's revenue, and the other allegations concern the intent of Defendants.  Since the heightened pleading standard of Rule 9(b) only applies to allegations of the fraudulent circumstances, and does not apply to allegations of intent or general background facts, PNG's argument fails.  *E.g.*, *Fla. Digital Network, Inc.*, 2006 WL 2523163, at *2 ("[I]f a party alleges fraud, the circumstances constituting fraud must be stated with particularity, except that malice, intent, knowledge, and state of mind may be stated generally."); Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.")

### 2.    Allegations of the Complaint Inconsistent with and Contradicted by Exhibits to the Complaint

PNG next argues that the allegations contained in paragraphs 19, 23, and 39 are contradicted by the exhibits attached to the Complaint, necessitating dismissal of Counts I and III.   (Doc. No. 40 at 20.)  Specifically, PNG argues that the email eBay sent to dealers whose listings were removed does not actually state that ACG and NNC graded coins are counterfeit.  (*Id.*)  PNG also contends that the ANA press release describing the new eBay policy does not refer to the policy as the "Ebay/ANA/PNG" policy, as Plaintiffs describe it.  (*Id.*)

PNG is correct that attachments to a complaint are considered part of the plaintiff's pleading and may negate contradictory allegations in the text of the complaint.  *See, e.g.*, *Gen. Elec. Cap. Corp. v. Posey*, 415 F.3d 391, 398 n.8 (5th Cir. 2005) (citing Fed. R. Civ. P. 10(c)).  The attachments

in question, exhibits J and M, contradict Plaintiffs' allegations to a certain extent.  (*Compare* Doc. No. 37 ¶19 (stating that eBay listed unapproved grading services as "counterfeit"), *with* Doc. No. 37-11 (containing an email subject line of "eBay Listing Removed: Counterfeit Currency and Stamps" but not otherwise explicitly referring to ACG and NNC as graders of counterfeit coins).) However, contradictory exhibits do not win the defendant an automatic dismissal.  *See Gen. Elec. Cap. Corp.*, 415 F.3d at 398 (considering attachments to the complaint for purposes of analyzing the sufficiency of the plaintiff's claims).  Accordingly, the Court will consider the attached exhibits when analyzing PNG's arguments concerning the sufficiency of Plaintiffs' claims.

### 3.     Count I: Conspiracy to Commit Trade Libel

PNG argues that Count I must be dismissed for several reasons.  First, PNG contends that the details of the alleged conspiracy are not pled with sufficient particularity because "plaintiffs failed to meet their obligation to plead sufficient facts to show that PNG entered into an agreement with eBay and ANA to commit trade libel."  (Doc. No. 40 at 22.)  Second, PNG argues that Plaintiffs have failed to establish the underlying tort of trade libel.  (*Id.*)  Third, PNG contends that Plaintiffs have failed to "allege that PNG had the intent to achieve an illegal goal."  (*Id.* at 23.)

PNG is correct that the Amended Complaint fails to allege the underlying tort of trade label. Under Florida law, a civil conspiracy claim must be premised on an underlying tort or cause of action.  *E.g., Ovadia v. Bloom*, 756 So. 2d 137, 140 (Fla. 3d DCA 2000).  Accordingly, Plaintiffs' conspiracy claim can only succeed if one or more of the conspirators actually committed trade libel.

To state a valid claim of trade libel, plaintiffs must allege: "(1) a falsehood[] (2) has been published, or communicated to a third person[,] (3) when the defendant-publisher knows or reasonably should know that it will likely result in inducing others not to deal with the plaintiff; (4)

in fact, the falsehood does play a material and substantial part in inducing others not to deal with the

plaintiff; and (5) special damages are proximately caused as a result of the published falsehood."

*Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1348 (M.D. Fla. 2006) (punctuation

altered).

In this case, Plaintiffs allege that the various Defendants are responsible for three

defamatory statements: (1) the ANA press release which refers to the new CCW policy;(2) the

emails eBay sent to coin dealers supposedly referring to ACG and NNC coins as "counterfeit"; and

(3) the emails sent to bidders in the auction of ACG and NNC graded coins notifying the bidders that

the auction was canceled.[22]  (Doc. No. 37 ¶ 42.)   The Court will analyze each statement in turn.

Because this analysis requires the Court to analyze the sufficiency of Count II, which is brought

against Defendants ANA and eBay, the Court will consider contemporaneously these Defendants'

Motions to Dismiss and Plaintiffs' Responses.

### a.       The ANA Press Release

In their Amended Complaint, Plaintiffs contend that the ANA press release is defamatory

by stating that the "Ebay/ANA/PNG policy is their effort to 'try to remove the opportunity to

commit fraud,'" which is "necessarily understood to refer to the Plaintiffs" and "permits the

inference that Plaintiffs NNC and ACG are not reliable and accurate grading services and serve as

---

[22]        It is somewhat unclear whether the emails sent to dealers and the emails sent to
bidders differed in content.  Paragraph 25 states that eBay "has subsequently publicly accused
Plaintiffs of grading and/or dealing in counterfeit items by publishing emails to third party dealers
and bidders stating that the listing has been cancelled due to it violating eBay's Counterfeit Currency
and Stamps policy . . . ." (Doc. No. 37 ¶ 25.) This paragraph, taken alone, could be interpreted as
stating that the same email was sent to both bidders and dealers.  However, the next paragraph states
that "eBay's publication of this email to dealers and the subsequent cancellation of listings is 'of and
concerning' the Plaintiffs . . . ." (*Id.* ¶ 26.)  Later in the paragraph, Plaintiffs devote a separate
sentence to the email sent to bidders. (*Id.*)

mere vehicles for fraud," and by providing a link to the "2006 P[N]G/ICTA survey, which falsely states that Plaintiff's [sic] coin grading services are 'poor' and 'unacceptable.'" (Doc. No. 37 ¶¶ 23-24.)  ANA contends that the press release cannot support a claim for trade libel because (1) it is contradicted by the attached exhibits in the sense that it actually "constitutes opinions by other individuals"; (2) Plaintiffs have failed to allege damages from the press release; (3) the release accurately reflects the opinion of ANA; (4) Plaintiffs fail to allege with particularity which statements are false; (5) inferences cannot serve as a basis for a claim of trade libel; (6) the non-verbal act of excluding Plaintiffs as coin graders cannot support a claim for defamation; and (7) the press release, even if defamatory, would be an example of "group defamation" because Plaintiffs are not specifically mentioned in the release.  (Doc. No. 44 at 3-11.)

ANA's statement regarding the "opportunity" to commit fraud actually reads as follows:

> "In order for consumer fraud to occur, three elements must be present: a person's desire, ability and opportunity to commit the fraud," said ANA Consumer Awareness Coordinator Susan McMillan, "We cannot control a person's desire or ability, but we can try to remove the opportunity."

(Doc. No. 37-14.)  Since there is no express false statement of fact in McMillan's quoted statement, Plaintiffs argue that the statement insinuates that ACG, NNC, Treasure Gallery, and Centsles have "availed themselves of the 'opportunity' to commit consumer fraud and are dealing in counterfeit coins."  (Doc. No. 37 ¶ 23.)  If the allegation is true,[23] Plaintiffs have established a "falsehood."  *See*

---

[23]     The inference is very difficult to draw based solely on the ANA press release and the PNG survey which is linked to it.  To begin, the ANA press release does not mention any of the Plaintiffs specifically.  Moreover, the PNG survey which is linked to the ANA release only mentions ACG and NNC, and it does so by stating that their services were evaluated as unacceptable and poor, not as counterfeit and fraudulent.  However, recognizing the procedural posture of this case, Plaintiffs are not required to present actual evidence supporting this inference until a motion for summary judgment is filed or the case proceeds to trial.  Since it is possible that additional evidence
(continued...)

*Belli v. Orlando Daily Newspapers, Inc.*, 389 F.2d 579, 582 (5th Cir. 1967) (Florida law permits innuendo to serve as a falsehood for purposes of a defamation claim).  Furthermore, the press release was published to third parties, and it is  reasonably clear that accusing a company of consumer fraud will damage the accused company's reputation with consumers.  Furthermore, Plaintiffs satisfy the requirement of  "inducing others not to deal with the plaintiff" by describing the harm to their reputations that they contend is linked to the press release.  (*Id.* ¶¶ 24-25.)

Nevertheless, Plaintiffs fail to sufficiently plead special damages.  Florida law requires a plaintiff claiming trade libel to prove special damages by establishing a "pecuniary loss that has been realized or liquidated, as in the case of specific lost sales."  *Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So. 2d 381, 388 (Fla. 4th DCA 1999) (quoting W. Page Keeton, et al.*, Prosser and Keeton on the Law of Torts* § 128 at 971 (5th ed.1984)).  In doing so, the plaintiff must establish more than general pecuniary harm.  *Id.*  Concerning the issue of pleading, Federal Rule of Civil Procedure 9 states that "[i]f an item of special damage is claimed, it must be  specifically stated."   Describing the interaction between Rule 9(b) and the requirement of proving special damages in trade libel cases, the Court in *KBT Corp., Inc. v. Cerdian Corp.*, 966 F. Supp. 369 (E.D. Pa. 1997) stated:

> "[E]ven under the liberal federal rules of pleading, it is necessary for the plaintiff to allege *either* the loss of particular customers by name, *or* a general diminution in its business, and extrinsic facts showing that such special damages were the natural and direct result of the false publication. If the plaintiff desires to predicate its right to recover damages upon general loss of custom, it should allege facts showing an established business, the amount of sales for a substantial period preceding the publication, and [the] amount of sales subsequent to the publication, facts showing

---

[23](...continued)
exists supporting this inference, dismissal of the claim on this basis would be inappropriate at this time.

that such loss in sales were the natural and probable result of such publication, and facts showing the plaintiff could not allege the names of particular customers who withdrew or withheld their custom.

*Id.* at 375 (quoting *Forum Publications, Inc. v. P.T. Publishers, Inc.*, 700 F. Supp. 236, 244 (E.D. Pa. 1988)) (internal quotations, brackets, and ellipses from original omitted; emphasis in original); *see also Browning v. Clinton*, 292 F.3d 235, 245 (D.C. Cir. 2002).

Plaintiffs stress that at least one judge in this district has held that the requirement of pleading special damages is subject to the general pleading requirements of Federal Rule of Civil Procedure 8(a) and not Rule 9(g). *See Leavitt v. Cole*, 291 F. Supp. 2d 1338, 1344-45 (M.D. Fla. 2003). In that case, the Court described the history of "special damages" in the law of defamation and concluded that the term relates to the "cause of action for actual loss" and not "the remedy of damages." *Id.* at 1343. Because the purpose of Rule 9(b) was limited to "giving proper notice of certain types of damage," the Court concluded, it did not warrant specificity in pleading special damages as part of a trade libel claim in Federal Court. *Id.* at 1345.

To the contrary, Florida law requires a trade libel plaintiff to prove special damages as part of his or her claim, and Rule 9(g) unequivocally states that "[i]f an item of special damage is claimed, it must be specifically stated." Even if *Leavitt* correctly describes the purpose behind Rule 9(g),[24] it is impossible to ignore that the plain language of the Rule squarely encompasses one of the

---

[24]     *Leavitt* did not actually cite to any authority discussing the purpose of Rule 9(g), and the commentary accompanying Rule 9 contains no discussion of subsection (g). However, at least one treatise has stated the following in reference to Rule 9(g):

In the second class of cases [including trade libel], the existence of special damages is an essential ingredient of the plaintiff's claim for relief; in other words, as a matter of substantive law recovery is impossible without demonstrating that the plaintiff sustained such damages. To some degree, therefore, Rule 9(g) demands more by

(continued...)

elements of establishing a trade libel claim.  Accordingly, Rule 9(g) requires Plaintiffs to plead special damages with specificity.[25]

Plaintiffs argue that they have pled sufficient damages because they allege that Defendants' statements prejudiced Plaintiffs in the conduct of their trade.  (Doc. No. 51 at 9 (citing *Diplomat Elec., Inc. v. Westinghouse Elec. Supply Co.*, 378 F.2d 377, 380 (5th Cir. 1967); *Kilgore Ace Hardware, Inc. v. Newsome*, 352 So. 2d 918, 920 (Fla. 2d DCA 1977)).)  Neither case supports Plaintiffs' position.  *Kilgore Ace Hardware, Inc.* did not address the issue of damages and did not purport to do away with the requirement of pleading special damages.  *Kilgore*, 352 So. 2d at 920. The case merely states that a trade libel claim may be grounded on statements that are "prejudicial in the conduct of a trade or business."  *Id.*  In *Diplomat Elec., Inc.*, the plaintiff proceeded under a theory of libel, rather than trade libel or disparagement of property, and the communication at issue was unambiguous and actionable *per se*.  *See Diplomat Elec., Inc.*, 378 F.2d at 385.

---

[24](...continued)
way of a statement of this aspect of the claim than is required by Rule 8(a)(2). This special damage requirement most often exists in cases of defamation, disparagement of property, and several other so-called "disfavored causes of action."

5A Charles Alan Wright & Authur R. Miller, *Federal Practice & Procedure* § 1310 (3d ed. 2005) (hereinafter "Wright & Miller").

[25]      The Court also disagrees with *Leavitt* that the application of Rule 9(g) to trade libel claims would unfairly hamper plaintiffs in asserting their claims.  *See Leavitt*, 291 F. Supp. 2d at 1345.  The necessary information concerning the plaintiff's special damages may be obtained in many cases by a limited pre-suit investigation.  Such a requirement would discourage baseless litigation and seems entirely consistent with trade libel's status as a "disfavored cause[] of action." *See* Wright & Miller, *supra*, at § 1310.

As discussed above, Rule 9(g) requires a greater specificity of pleading than simply alleging that statements were prejudicial to one's business and caused pecuniary harm.  Plaintiffs do not meet this burden in the Amended Complaint.[26]

      **b.**    **EBay's Email to Dealers Concerning the Violation of the Counterfeit Coin and Stamp Policy**

Plaintiffs allege that eBay's email to coin dealers concerning the removal of their listings was defamatory by "leaving a reasonable reader with the understanding that NNC and ACG-graded coins are counterfeit."[27]  (Doc. No. 37 ¶ 26.)  According to Plaintiffs, "[t]he audience for these emails are prior, existing, and potential clients and customers of Plaintiffs and the clear intent of the message

---

[26]      ANA's other arguments in support of dismissal are unpersuasive.  The first and third arguments, which seek to characterize the press release and linked survey as non-actionable "opinion," fail to recognize the innuendo that Plaintiffs draw from the interplay between ANA's statements regarding the "opportunity" to commit fraud and PNG's survey.   ANA's fourth argument, that Plaintiffs fail to allege with particularity which statements are false, is similarly contradicted by the Amended Complaint.  (Doc. No. 37 ¶ 23.)  ANA's argument that inferences cannot serve as a basis for a claim of trade libel is not supported by case law and does not appear to be legally correct.  Inferences play a significant role in human communication, and a rule that statements must always be taken for their literal meaning would make little sense.  *See, e.g.*, *Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1385 ("Fortson's assumption that reasonable people read words in a vacuum, according to their dictionary definition, is ill-founded.") (S.D. Fla. 2006).  Likewise, ANA's sixth argument fails because even if "the non-verbal act of excluding Plaintiffs as coin graders cannot support a claim for defamation," Plaintiffs allege that ANA has taken the "verbal act" of accusing Plaintiffs of engaging in consumer fraud.  (*See* Doc. No. 37 ¶ 23.)  Finally, Plaintiffs allege that ANA's statements can be attributed to them despite the fact that ANA's press release does not mention any of them by name, and ANA's argument that Plaintiffs are actually part of a large "group" requires the Court to consider matters that are outside the four corners of the Amended Complaint and attached exhibits.

[27]      eBay also argues that the actual adoption of the counterfeit coin policy, as well as descriptions of the policy, cannot support a claim for trade libel because the adoption of a generally applicable policy is not "of and concerning" Plaintiffs.  (Doc. No. 52 at 15.)  However, Plaintiffs do not appear to rely on this theory of liability in their response to eBay's motion, and the Amended Complaint does not clearly plead a claim of trade libel on the theory.  Accordingly, the Court will construe Plaintiffs' claim for trade libel against eBay as predicated only on the emails eBay sent to dealers and bidders concerning removed listings.

is to deter consumers from doing business with Plaintiffs." (*Id.*) eBay argues that these emails were not defamatory because they did not contain any false statements; they were not published to third parties; eBay did not know the allegedly false statements were false; and Plaintiffs fail to allege special damages. (Doc. No. 52 at 11-20.) The Court will analyze each of these arguments below.

The Court rejects eBay's claim that the email sent to dealers did not contain a falsehood, because the subject line of the email insinuates that ACG and NNC grade counterfeit coins. eBay contends that "[t]he mere appearance of the word 'counterfeit' in the title of the coins policy--and the reference to the policy by name in the subject line of the emails--does not constitute an accusation that the coins are counterfeit or that the sellers are committing a criminal offense." (Doc. No. 52 at 14.) eBay is correct in the sense that some, perhaps many, readers would read the entire email, fully understand the context in which the word "counterfeit" was used, and not assume that ACG and NNC were graders of counterfeit coins. However, as with ANA's press release, some readers might conclude otherwise. The subject line of the email stated "eBay Listing Removed: Counterfeit Currency and Stamps" and did not reference the policy or its terms, giving the impression that eBay is informing the dealer that it is selling counterfeit items. Later in the email, eBay explains that only some graders of coins are authorized by eBay. Thus, the Court cannot hold as a matter of law that these statements do not imply through innuendo that the company which graded the dealer's coins (and was not listed in the email as authorized) grades counterfeit coins.[28]

However, the requirement of "publication" is met only with respect to the claims brought by ACG and NNC. According to the Amended Complaint, eBay sent the allegedly defamatory email

---

[28]     Again, it bears noting that this conclusion is prompted in large part by the procedural posture of the case. *See*, *supra*, at 32 n.18.

only to the dealers whose listings were removed.  (Doc. No. 37 ¶¶ 25-26.)   Thus, to the extent this email could be considered "of and concerning" Plaintiffs Treasure Gallery and Centsles, it was sent only to the allegedly defamed parties and therefore was not "published" with respect to those parties. On the other hand, to the extent the email is considered "of and concerning" Plaintiffs ACG and NNC, the email was published to third parties because it was sent to the dealers who sold the ACG and NNC graded coins.

eBay next argues that Plaintiffs fail to allege "facts--not mere conclusions-- sufficient to show that eBay acted with improper intent or bad faith."  eBay acknowledges Plaintiffs' allegations that "Defendant's conduct was undertaken willfully and was done with a malicious intent" and "disparaging statements" were made with "malice" or "reckless disregard," but stresses that such allegations are conclusions which are insufficient to state a claim.  (Doc. No. 52 at 17 (citing *Twombly*, 127 S. Ct. at 1964-65).)  However, eBay misconstrues *Twombly* by arguing that  greater specificity is required.  According to the *Twombly* Court, "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Id.* at 1965.  In the context of stating a claim for violating section one of the Sherman Act, the Court required that there be "enough factual matter (taken as true) to suggest that an agreement was made."  *Id.*  In this case, Plaintiffs have pled enough factual matter to suggest that eBay intended to cause injuries to the Plaintiff, or at the very least, acted with reckless disregard.  Specifically, Plaintiffs allege that the CCW policy was driven by animosity toward smaller coin dealers, that eBay sent an email to dealers with the subject line, "eBay Listing Removed: Counterfeit Currency and Stamps," and that the actions were taken intentionally.  (Doc. No. 37 ¶¶ 25, 27, 30.)   Taken together, the allegations are "enough to raise a right to relief above the speculative level."

Finally eBay is correct that Plaintiffs fail to sufficiently plead special damages.  As discussed above, Plaintiffs must plead the special damages required by Florida law with the specificity required by Federal Rule of Civil Procedure 9(g).  Plaintiffs have not done so.

### c.  eBay's Email to Bidders Stating that the Auction was Cancelled

Plaintiffs allege that eBay sent an email to bidders notifying them that the auction was cancelled.  (Doc. No. 37 ¶ 26.)  According to Plaintiffs:

> When the bidder receives an email stating that the listing has been cancelled, the effect of the message would leave a reasonable reader with the understanding that TREASURE GALLERY's and CENTSLES's NNC-graded and/or ACG-graded coins are counterfeit. After receiving such an e-mail, Plaintiff dealers are tainted, and bidders are less likely to return to a dealer/lister whose auction has been cancelled due to the coins allegedly violating eBay's Counterfeit Coins policy.

(*Id.*)  eBay argues that this email cannot be considered defamatory because Plaintiffs do not even describe the email or label it as a falsehood.  (Doc. No. 52 at15 n.7.)  Rather, the email informed bidders of a nonverbal act.  (*Id.* at 13.)

The Court agrees with eBay.  Unlike the press release describing the opportunity to commit "fraud" or eBay's email which used the word "Counterfeit" in the subject line without reference to the policy, the email to bidders merely expressed a non-verbal act.  *See Hoon v. Pate Const. Co., Inc.*, 607 So. 2d 423, 428-29 (Fla. 4th DCA 1992) (rejecting the argument that the decision to decline a contractor's low bid could constitute defamation).  Furthermore, Plaintiffs have failed to allege special damages as explained above.

Accordingly, Plaintiffs have failed to establish in the Amended Complaint that any of the alleged conspirators committed the underlying tort of trade libel.  Therefore, Plaintiffs cannot maintain a claim for conspiracy to commit trade libel against PNG.[29]

### 4.    Count III: FDUTPA

PNG moves to dismiss Plaintiffs' claim under the FDUTPA, arguing that Plaintiffs failed to allege that PNG was engaged in "trade or commerce" and that PNG's actions constituted an unfair practice.

The FDUTPA declares "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce" to be unlawful.  Fla. Stat. § 501.204(1).  The Act creates a private cause of action for declaratory and injunctive relief for "anyone aggrieved by a violation of this part," Fla. Stat. § 501.211(1), and as of July 1, 2001, a private cause of action for actual damages, attorney fees and court costs for "a person who has suffered a loss as a result of a violation of this part."  Fla. Stat. § 501.211(2).[30]  A "violation of this part" means any violation of the FDUTPA or rules adopted under it and may be based upon:

---

[29]    The Court finds PNG's other grounds for dismissal of the conspiracy claim to be without merit.  PNG's claim that Rule 9(b) applies to claims of civil conspiracy to commit trade libel and therefore requires greater specificity in pleading is contradicted by the authority which it cites in support of the argument.  *See* Wright & Miller, *supra*, at § 1233 (noting that civil conspiracy claims are typically subject to Federal Rule of Civil Procedure 8 except when they involve claims of fraud).  The conspiracy claim is premised on trade libel, not fraud.  (Doc. No. 37 ¶¶ 37-48.) Furthermore, PNG's argument that Plaintiffs have failed to allege an intent to achieve an illegal goal is contradicted by Plaintiffs' allegations that Defendants intended to defame them and cause them injury.  (*Id.* ¶¶ 34.)  Furthermore, Plaintiffs must only allege an intent to commit a tort, not a crime. *C.f.*, *Ginsberg v. Lennar Fla. Holdings, Inc.*, 645 So. 2d 490, 501 (Fla. 3d DCA 1994) (analyzing civil liability under Florida's RICO statute).

[30]    Before July 1, 2001, the cause of action could only be maintained by consumers.  The Act was revised to replace "consumer" with "person."

(a) Any rules promulgated pursuant to the Federal Trade Commission Act, 15 U.S.C. s. 41 et seq.;

(b) The standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or the federal courts;

(c) Any law, statute, rule, regulation or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices.

Fla. Stat. § 501.203(3).

To determine whether the alleged conduct violates the FDUTPA, courts should take into consideration "whether the Federal Trade Commission and other federal courts deem such conduct to be an unfair method of competition or an unconscionable, unfair or deceptive act or practice under federal law." *Fla. v. Tenet Healthcare Corp.*, 420 F. Supp. 2d 1288, 1309-10 (S.D. Fla. 2005) (quoting *Mack v. Bristol-Myers Squibb Co.*, 673 So.2d 100, 105 (Fla. 1st DCA 1996)) (internal quotations omitted).   In sum, to plead a violation the FDUTPA, a plaintiff must allege: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Rollins, Inc. v. Bultand*, 951 So.2d 860, 869 (Fla. 2d DCA 2006).   PNG's challenges concern the first of these three elements.

In paragraph seven, Plaintiffs allege that PNG is comprised of a group of coin dealers that conduct business in the industry associated with the numismatic hobby.  (Doc. No. 37 ¶ 7.)  As such, Plaintiffs have alleged that PNG engages in "trade or commerce."[31]  Nevertheless, Plaintiffs fail to establish that the allegedly unfair and deceptive acts in this case violate rules promulgated pursuant to the Federal Trade Commission Act, federally-established standards of unfairness and deception, or "any law, statute, rule, regulation or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices."  Fla. Stat. § 501.203(3).  Plaintiffs'

---

[31]     PNG has not provided any authority suggesting that a trade association in a hobby-related industry does not engage in trade or commerce for purposes of the FDUTPA.

argument on this point is that they "allege that PNG conducted and utilized a coin grading survey

that was intended to defame [P]laintiffs." (Doc. No. 45 at 18.)  Critically, however, Plaintiffs have

failed to sufficiently plead a claim of trade libel or conspiracy to commit trade libel, and they do not

point to any other source of law that would recognize the alleged conduct in this case as "unfair" or

"deceptive"[32] within the purview of the express requirements of FDUTPA.

## II.     ANA's Motion to Dismiss

ANA moves to dismiss Counts I, II, and III of Plaintiffs' Amended Complaint.  (*See* Doc.

No. 44.)  Because the Court has held that Plaintiffs did not plead sufficiently an underlying tort of

trade libel for purposes of their civil conspiracy claim, ANA's request must be granted with respect

to both Counts I and II of the Amended Complaint.   Likewise, the Court's rationale for dismissing

the FDUTPA claim against PNG mandates dismissal of the FDUTPA claim against ANA, because

Plaintiffs have failed to establish a violation of FDUTPA as defined by section 501.203(3) of the

Florida Statutes.

## III.    eBay's Motion to Dismiss

---

[32]     For instance, the facts alleged are insufficient to establish that Defendants' alleged
scheme violated the federal or state antitrust laws.  *See ASA Accugrade, Inc. v. Am. Numismatic
Ass'n*, No. 6:05-cv-1285-Orl-19DAB, 2006 WL 1640698, at * 9 (M.D. Fla. 2006); *ASA Accugrade,
Inc. v. Am. Numismatic Ass'n*, 370 F. Supp. 2d 213, 217 (D.D.C. 2005).  Similarly, Plaintiffs have
not pled the elements necessary to establish a deceptive act in violation of the Federal Trade
Commission Act.  *See F.T.C. v. Peoples Credit First, LLC*, 244 F. App'x 942, 944 (11th Cir. 2007).
In filing an Amended Complaint, Plaintiffs should pay close attention to the specific requirements
of establishing an "unfair" or "deceptive" practice as defined by section 501.203(3) of the Florida
Statutes.  Plaintiffs cannot satisfy this requirement by merely attaching the label "unfair and
deceptive" to acts that do not fall within the scope of this section.  *See Marco Island Cable, Inc. v.
Comcast Cablevision of the S., Inc.*, No. 2:04-CV-26-FTM-29DNF, 2006 WL 1814333, at 6-10
(M.D. Fla. July 3, 2006) (distinguishing between anti-competitive conduct that falls within the scope
of FDUTPA's private cause of action and conduct that does not).

Plaintiffs have failed to state claims for Counts I, II, and III against eBay for the reasons stated above.  However, eBay also moves for dismissal on grounds that it has "complete immunity" under the Communications Decency Act, 47 U.S.C. § 230.  (Doc. No. 52 at 2.)  Because eBay argues that it enjoys "complete immunity" from liability, it presumably moves for dismissal of Plaintiffs' claims with prejudice.[33]  As such, it is appropriate for the Court to consider this ground for dismissal because it entails a different form of relief than requested by ANA and PNG.

Section 230 provides that:

No provider or user of an interactive computer service shall be held liable on account of–

(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

(B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).[34]

*Id.* § 230(c)(2).  The statute also explains that it was prompted in part by a need "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services . . ." and "remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material . . . ."  *Id.* § 230(b)(1), (4).

---

[33]     eBay does not state whether it moves for dismissal with or without prejudice; however, the dismissal of an action on grounds of absolute immunity is typically with prejudice. *See, e.g.*, *Baxter v. Washington*, 201 F. App'x 656, 658 (11th Cir. 2006).

[34]     The statute should presumably read "paragraph (A)" instead of "paragraph (1)."  47 U.S.C.A. § 230 (West 2008).

eBay contends that Plaintiffs' allegations establish that eBay is an "interactive computer service" within the meaning of the Act.  (Doc. No. 52 at 8 (citing *Gentry v. eBay Inc.*, 99 Cal App. 4th 816, 831 n.7 (Cal. Ct. App. 2002).)  As such, eBay argues, it is immune from liability for the "good faith" removal of "objectionable" content such as the sale of counterfeit items.  (*Id.* at 9.) Moreover, eBay argues that Plaintiffs claims "impermissibly treat eBay as the 'publisher' of information provided by another content provider."  (*Id.* at 10.)  Plaintiffs do not dispute that eBay is an interactive computer service.  However, they argue that "objectionable" material does not include the removal of a coin auction and that subsection (c)(2) does not even apply to eBay because eBay itself created the defamatory emails.  (Doc. No. 56 at 3-8.)

The Court agrees that eBay's arguments are unsound.  As an initial matter, the Court rejects eBay's contention that section 230 provides it with "complete immunity."  Section 230(c)(2) provides that the immunity afforded to interactive computer services is limited by the requirement of "good faith."  Such requirement is inconsistent with the creation of an absolute immunity or privilege.  *See, e.g.*, *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964) (recognizing a qualified privilege for defamation suits by a public official that yields upon showing of actual malice); *Slicker v. Jackson*, 215 F.3d 1225, 1232-33 (11th Cir. 2000) (qualified immunity for a law enforcement officer's use of force provided, in part, that the officer used force in good faith); *Hidalgo Corp. v. J. Kugel Designs, Inc.*, 509 F. Supp. 2d 1247,  1265 (S.D. Fla. 2007) (qualified privilege for claims of slander under Florida law provided that the statements were made in good faith by one with a duty or interest in the subject matter of the statements).  At most, section 230 provides eBay with a qualified privilege that must be asserted as an affirmative defense.  With allegations in the Amended Complaint that eBay acted in bad faith, the Court should not grant dismissal under Federal

Rule of Civil Procedure 12(b)(6).  *Marsh v. Butler County*, 268 F.3d 1014, 1022 (11th Cir. 2001) (holding that when presented with an affirmative defense in a motion to dismiss, a court can dismiss a complaint under Rule 12(b)(6) "when its allegations--on their face--show that an affirmative defense bars recovery on the claim").

Moreover, eBay's construction of the term "objectionable" is not persuasive.   The word itself is vague, general, and taken alone, ambiguous.  Defined by the Oxford English Dictionary, "objectionable" means  "[o]pen to objection; that may be objected to; against which an adverse reason may be urged; now often in a weakened sense: [e]xciting disapproval or dislike, unacceptable, disagreeable, unpleasant."  Oxford English Dictionary (2d ed. 1989).  In the context of section 230, "objectionable" is preceded by the words "obscene, lewd, lascivious, filthy, excessively violent, [and] harassing." 47 U.S.C. § 230(c)(2).  The statute also explains that its passage was prompted by a desire to encourage the development of "filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material." *Id.* § 230(b)(4).

It is difficult to accept, as eBay argues, that Congress  intended the general term "objectionable" to encompass an auction of potentially-counterfeit coins when the word is preceded by seven other words that describe pornography, graphic violence, obscenity, and harassment. When a general term follows specific terms, courts presume that the general term is limited by the preceding terms.  *Begay v. United States*, 128 S. Ct. 1581, 1584-85 (2008) ("If Congress meant the latter, i.e., if it meant the statute to be all-encompassing, it is hard to see why it would have needed to include the examples at all."); *Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 128 S. Ct. 1396, 1404 (2008) ("Under [the cannon of *ejusdem generis*], when a statute sets out a series of specific items

ending with a general term, that general term is confined to covering subjects comparable to the specifics it follows."); *Hill v. Rent-a-Center, Inc.*, 398 F.3d 1286, 1289 (11th Cir. 2005) ("[E]*jusdem generis* . . . provides that general words following specific words in statutes should be interpreted to be similar in nature to the specific words they follow.").

One may find an array of items objectionable; for instance, a sports fan may find the auction of a rival team's jersey objectionable.   However, Congress provided guidance on the term "objectionable" by providing a list of seven examples and a statement of the policy behind section 230.   Accordingly, the Court concludes that "objectionable" content must, at a minimum, involve or be similar to pornography, graphic violence, obscenity, or harassment.   *See* 47 U.S.C. § 230(c)(1).[35]   While there may be many reasons to object to the sale of potentially counterfeit items through an online auction, Congress has given no indication that an auctioneer's removal of such items falls within the scope of the immunity provided section 230(c)(1).[36]   Accordingly, eBay is not entitled to immunity on the set of facts alleged in the Amended Complaint.

## Conclusion

---

[35]   The Court is aware of only one other federal case that has examined the meaning of "objectionable" as used in section 230.  *See Lagdon v. Google, Inc.*, 474 F. Supp 2d 622, 631 (D. Del. 2007).  *Lagdon* held that several search engines could not be liable for refusing to carry an advertisement that Google described as "advocat[ing] against an individual, group, [or] organization . . . ."  *Id.* at 626, 631.  Although the opinion contains some broad language concerning "immunity for . . . editorial decisions" and did not consider the cannon of *ejusdem generis* or the policy behind section 230, the holding is entirely consistent with this Court's reasoning to the extent that advocating "against a group" is similar to "harassment."

[36]   The Court also rejects eBay's contention that section 230 encompasses the allegedly defamatory emails that concerned the removal of listings.  eBay fails to recognize the difference between removing content and creating content.  *See Fair Housing Council of San Fernando Valley v. Roomates.com, LLC*, 521 F.3d 1157, 1163 (9th Cir. 2008) ("Congress sought to immunize the removal of user-generated content, not the creation of content.")

1.      The Motion of Defendant Professional Numismatists Guild, Inc. to Dismiss Counts I and III of the Complaint for Damages and Injunctive Relief and Integrated Memorandum of Law (Doc. No. 19, filed Feb. 11, 2008), the Motion of Defendant eBay to Dismiss Plaintiffs' Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) and Memorandum of Points and Authorities in Support Thereof (Doc. No. 25, filed Feb. 15, 2008), and the Motion of American Numismatic Association to Dismiss Plaintiff's [sic] Complaint with Supporting Memorandum of Law (Doc. No. 30, filed Feb. 22, 2008) are **DENIED** as moot by virtue of the later filed Amended Complaint and Motions to Dismiss.

2.      The Motion of Defendant Professional Numismatists Guild, Inc. to Dismiss Counts I and III of the First Amended Complaint for Damages and Injunctive Relief and Integrated Memorandum of Law (Doc. No. 40, filed Mar. 17, 2009) is **GRANTED**;

3.      The Motion of American Numismatic Association to Dismiss Plaintiffs' Amended Complaint with Supporting Memorandum of Law (Doc. No. 44, filed Mar. 31, 2008) is **GRANTED**;

4.      Motion of Defendant eBay Inc. to Dismiss Plaintiffs' First Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) and Memorandum of Points and Authorities in Support Thereof (Doc. No. 52, filed Apr. 15, 2008) is **GRANTED in part** and **DENIED in part**. The Motion is granted to the extent that eBay seeks dismissal for Plaintiffs' failure to state a claim upon which relief can be granted and denied to the extent eBay seeks dismissal on grounds of absolute immunity under the Communications Decency Act.

5.      Plaintiffs' Amended Complaint is **DISMISSED without prejudice**. Plaintiffs have **ten (10) days** from the date of this Order to file an amended complaint that alleges a basis for

asserting personal jurisdiction over Defendant PNG and in accordance with this Order states

claims upon which relief can be granted.  Failure to comply with this Order may result in

dismissal of this action with prejudice and without further notice.

**DONE** and **ORDERED** in Chambers in Orlando, Florida on July 8, 2008.

PATRICIA C. FAWSETT, CHIEF JUDGE
UNITED STATES DISTRICT COURT

Copies furnished to:

Counsel of Record